**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-589-2 (RDM)** |
| **v.** | : | |
| | : | |
| **JOSEPH IRWIN** | : | |
| | : | |
| **and** | : | |
| | : | |
| **JOHN JOSEPH RICHTER,** | : | |
| | : | |
| **Defendants.** | : | |

**UNITED STATES' MEMORANDUM**
**REGARDING CHARGES BROUGHT UNDER 18 U.S.C. § 1752**

On January 22, 2024, the Court requested additional briefing relating to the proper interpretation of Counts Two through Six of the Third Superseding Indictment (ECF 54), which involve charges brought under 18 U.S.C. § 1752. As explained below, Section 1752's text, structure, and context support the conclusion that Congress intended to require that a defendant know he was entering or remaining in a "posted, cordoned off, or otherwise restricted area"— words that immediately follow "knowingly" when the definition of "restricted building or grounds" is inserted—but not to know why the area was restricted. Thus, the Court's jury instructions as provided in *United States v. Vargas* were proper and should be applied here. *See United States v. Vargas*, Case No. 21-cr-47 (RDM), ECF 53-1 at 26.

A.      **Section 1752 Does Not Require a Defendant to Know Why the Area Was**
        **Restricted and, in Any Event, the Evidence Here Is Sufficient Under Any**
        **Reading of the Statute.**

The issue on which this Court requested briefing is whether, at trial, the government is required to show that the defendant knew not only that he was in an area that was "posted, cordoned off, or otherwise restricted," but also that "the President or other person protected by the Secret

Service [wa]s or w[ould] be temporarily visiting" the relevant building or grounds, § 1752(c)(1). For the reasons discussed below, the answer is no.[1]

Sections 1752(a)(1) and (a)(2) make it a crime to, respectively: (1) "knowingly enter[] or remain[] in any restricted building or grounds"; and (2) "knowingly . . . engage[] in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds." 18 U.S.C. §§ 1752(a)(1), (2). In turn, the term "restricted area" means, as relevant here, "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." § 1752(c)(1)(B). And the term "other person protected by the Secret Service" means "any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection." § 1752(c)(2).

Whether "a criminal statute requires the Government to prove that the defendant acted knowingly is a question of congressional intent." *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019). Courts begin with the presumption "that Congress intends to require a defendant to possess a culpable mental state regarding each of the statutory elements that criminalize otherwise innocent

---

[1] This issue is currently on appeal in *United States v. Griffin*, 22-3042 (D.C. Cir.). At least five judges have rejected an argument requiring knowledge of the Vice President's presence, finding that the statute does not require proof of knowledge of the federal-protectee requirement. *See United States v. Griffin*, No. 21-cr-92 (TNM), ECF No. 106, at 330-32; *United States v. Samsel*, No. 21-cr-537 (JMC), ECF No. 313 (provisionally accepting the government's position); *United States v. Eicher*, No. 22-cr-38 (BAH), Trial Tr. at 7-8 (June 14, 2023); *United States v. Vo*, No. 21-cr-509 (TSC), Trial Tr. at 1199-1200 (Sept. 22, 2023); *United States v. Rhine*, No. 21-cr-687, ECF No. 104 (Apr. 24, 2023) ("Nowhere does the statute even suggest that the defendant must know the details of the visit. Indeed, a contrary reading would defeat the protective purpose of the statute, as some degree of secrecy is often integral to Secret Service protection."). On the other hand, three judges have stated or ruled that "knowingly" applies to the federal-protectee requirement. *See United States v. Hostetter*, No. 21-cr-392 (RCL), 2023 WL 4539842 (D.D.C. July 13, 2023); *United States, v. Elizalde*, No. 23-cr-170 (CJN), 2023 WL 8354932 (D.D.C. Dec. 1, 2023); *United States v. Groseclose*, No. 21-cr-311 (CRC), ECF No. 99 (D.D.C. Jan. 5, 2024).

conduct." *Id.* (quotation marks omitted). However, as Judge Cooper recently recognized in *United States v. Groseclose*, No. 1:21-cr-311-CRC, ECF No. 99 (Jan. 5, 2024), the opposite presumption applies to a statute's "[j]urisdictional elements." *Id.* at 13. That is, Congress does not ordinarily intend to require a defendant's knowledge of jurisdictional elements. *Rehaif*, 139 S. Ct. at 2196.

Here, the federal-protectee element—*i.e.*, the requirement that "the President or other person protected by the Secret Service [wa]s or w[ould] be temporarily visiting" the area—is jurisdictional. The Supreme Court's decision in *United States v. Feola*, 420 U.S. 671 (1975), which declined to extend a mens rea requirement to the federal-nexus requirement presented in that case, makes that clear. Indeed, *Groseclose* correctly observed that a court considering Section 1752 "as it stood when first enacted as part of the Omnibus Crime Control Act of 1970, Pub. L. No. 91-644, 84 Stat. 1880, 1891-1892 (1971), . . . would be hard-pressed to see meaningful daylight between *Feola*" and the present case. *Groseclose*, at 16. And while *Groseclose* took a wrong a turn when it then found that Congress's 2006 amendments to Section 1752 transformed a previously "jurisdictional" requirement into something else, *Groseclose* correctly identified the jurisdictional nature of Section 1752(c)(1) as a dispositive question. Nor does *United States v. Elizalde*, No. 23-cr-170 (CJN), 2023 WL 835932 (D.D.C. Dec. 1, 2023)—which did not consider whether the federal-protectee element in subsection 1752(c)(1)(B) is jurisdictional—warrant a different result. In sum, the presence of a Secret Service protectee is jurisdictional under *Rehaif* and *Feola*.

Even if this this Court disagrees that the presence of a Secret Service protectee is jurisdictional, the statute's text does not demand that its "knowingly" requirement extend to the reasons why an area is "posted, cordoned off, or otherwise restricted"—which are facts that do not separate innocent from wrongful conduct. Such a requirement cannot be squared with Congress's

intent in enacting Section 1752(a)(1).In any event, the trial evidence in this case will prove that these Defendants knew that the Vice President was present at the Capitol on January 6.

      1.      **Section 1752 Does Not Require Knowledge that a Secret Service Protectee Is Present Because that Element is Jurisdictional.**

          a.      **The Presumption of Scienter Ordinarily Does Not Extend to Jurisdictional Elements.**

The clearest indication that Congress did not intend to require knowledge of the Secret Service's protectee's presence is the jurisdictional nature of that criteria. As the Supreme Court has held, Congress normally does not intend to extend scienter to an offense's jurisdictional elements. *Rehaif*, 139 S. Ct. at 2196. In *Rehaif*, the Court considered the mens rea required under 18 U.S.C. § 924(a)(2)'s penalty for anyone who "knowingly violates" subsection 922(g). Subsection 922(g), in turn, prohibits certain classes of individuals from (among other acts) "possess[ing]" a firearm "in or affecting" interstate commerce. *Rehaif* held that a violation of Sections 922(g) and 924(a)(2) required proof that the "defendant knew both that he engaged in the relevant conduct (that he possessed a firearm) and also that he fell within the relevant status (that he was a felon, an alien unlawfully in this country, or the like)." 139 S. Ct. at 2194. But, importantly, *Rehaif* also made clear that the statute's knowledge requirement does *not* extend to the jurisdictional interstate-commerce elements of § 922(g), reasoning (and reaffirming) that jurisdictional elements "normally have nothing to do with the wrongfulness of the defendant's conduct" and, thus, "are not subject to the presumption in favor of scienter." 139 S. Ct. at 2196.

Section 1752 has a similar structure to the statute in *Rehaif* and likewise warrants a similar analysis. Section 1752(a), like Section 924(a)(2), criminalizes certain "knowing" conduct (*i.e.*, the entering or remaining without lawful authority in a restricted building or grounds). And Section 1752(c)(1), like Section 922(g), sets the contours of the offense by (i) defining the substance of

the prohibited conduct (*i.e.*, that the trespassed building or grounds must be "posted, cordoned off, or otherwise restricted"); and (ii) limiting the offense to instances implicating a federal nexus ("of a building or grounds where the President or other person protected by the Secret Service or will be temporarily visiting"), 18 U.S.C. § 1752(c)(1)(B).

Given the similarity in the statutes' respective structures, *Rehaif* demonstrates that the knowledge requirement in Section 1752(a)(1) applies to each of the phrases in the statute's operative provision (including to the statute's location requirement (*i.e.*, "restricted building or grounds")). Section 1752(a)(1) also requires proof of the defendant's knowledge that the area is a "posted, cordoned off, or otherwise restricted area." Further, *Rehaif* demonstrates that the "knowingly" requirement does not extend to the additional federal-protectee requirement in Section 1752(c)(1)(B) if that requirement is "jurisdictional" in the *Rehaif* sense. Thus, a key question in this case is: is the federal-protectee element a jurisdictional one for mens rea purposes?

As Judge Cooper explained in *Groseclose*, the Supreme Court's decision in *United States v. Feola*, 420 U.S. 671 (1975), provides the framework for answering that question. In *Feola*, the Court considered whether assault upon a federal officer while engaged in the performance of his official duties, in violation of 18 U.S.C. § 111, requires proof of the defendant's "knowledge that the intended victim is a federal officer." 420 U.S. at 672-73. In deciding whether to extend the mens rea requirement to the federal-victim element, *Feola* looked to whether the element was "jurisdictional only"—*i.e.*, whether the relevant fact "need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute." 420 U.S. at 676 n.9.

Applying this inquiry to Section 111, the Court determined that the government was not required to prove the defendant's knowledge that the victim of his assault is a federal officer. 420 U.S. at 686. The Court's reasoning turned on its understanding of Congress's intent in enacting

Section 111. *Feola* posited that, *if* Congress intended Section 111 "to fill a gap in the substantive law of the States"—*i.e.*, to more severely punish assaults committed against federal officers—then Section 111 should be treated "as a federal aggravated assault statute" and read as requiring the added mens rea that typically attaches to aggravating elements. 420 U.S. at 683. But *Feola* declined to find such a congressional intent in Section 111. Rather, the Court determined that Congress' primary intent in enacting Section 111 was limited: to provide a federal forum for the prosecution of those who assault federal officials, in part out of concern with uneven enforcement by state authorities under existing state assault statutes. *Id.* at 684. Because the federal-victim element's function was jurisdictional (as opposed to being a substantive aggravating element), no mens rea attached to it.

Just as important in understanding *Feola* is what the Court did *not* find dispositive in that case—*i.e.*, which arguably substantive features did not carry the day. One such feature was inferences about congressional intent based on nuance in the statute's penalty structure. At the time *Feola* was decided, an unarmed assault of a federal officer in violation of Section 111 was "punishable by a sentence of three years' imprisonment and a $5,000 fine"—"a harsher penalty than [was] typically imposed for an unarmed assault on a private citizen." 420 U.S. at 702 (Stewart, J., dissenting). And those penalties were also distinct—and different—from the penalties for garden-variety federal assault within the admiralty, maritime, or territorial jurisdictional of the United States. *Id.* at 703 (Stewart, J. dissenting). Indeed, the dissenters in *Feola* would have extended the statute's mens rea requirement to the federal-victim requirement largely on that ground. *Id.* at 702-03. But the Court did not. The Court concluded that, Section 111's unique (and harsher) penalties notwithstanding, the statute's federal-victim requirement was jurisdictional, not an aggravating element, for mens rea purposes.

Section 1752's legislative history makes clear that Congress intended the federal-protectee requirement to serve as a jurisdictional element. As Judge Cooper in *Groseclose* noted, a court considering Section 1752 "as it stood when first enacted as part of the Omnibus Crime Control Act of 1970, Pub. L. No. 91-644, 84 Stat. 1880, 1891-1892 (1971), . . . would be hard-pressed to see meaningful daylight between *Feola* and the present case." As in *Feola*, when Congress enacted Section 1752, it was "motivated by a desire to federalize ordinary state-law offenses in order to achieve more certainty and uniformity over security measures involving important federal officers." *Groseclose*, at 16. It continued:

> The Senate Report [accompanying Section 1752's enactment in 1971] explained that the new law was "designed to provide a uniform minimum of Federal jurisdiction for Presidential security when the President is on temporary visits." S. Rep. 91-1252, at 6 (1970). Before the enactment of § 1752, the report noted, the "Secret Service [had to] rely upon the assistance of local authorities to arrest persons who may be guilty of such disruptive conduct. In a quieter era, this system worked relatively well. [By 1970], however, it ha[d] become increasingly difficult to maintain the necessary level of security in this method." *Id.* at 7. For example, it was often "difficult to tell exactly which jurisdiction [bore] the responsibility for detention and prosecution. Moreover, each jurisdiction utilize[d] different criminal statutes, with different elements of crime, which ma[de] Secret Service agents unsure of the legal extent of their authority and ma[de] uniform enforcement impossible. *Id.*

*Groseclose*, at 16-17 (quoting S. Rep. 91-1252 (1970)).[2]

Other passages in the same Senate Report make Congress' intent even clearer. *See, e.g.*, S. Rep. 91-1252, at 9 ("No longer . . . will Presidential security depend on differing local ordinances, some of which may be of dubious constitutionality. Instead, [the bill] will provide for consistent, uniform enforcement of a narrow, precisely drawn statute that proscribes specific

---

[2] To be sure, Section 1752's aims included the protection of the President and other persons protected by the Secret Service, just as the statute in *Feola* aimed to protect federal officers. *Feola*, 420 U.S. at 680. But just as in *Feola*, that does not mean that Congress intended to condition liability on the defendant's knowledge of a federal protectee's presence.

conduct for the protection of the President"). And, in describing Congress' intent in enacting Section 1752, the Senate Report expressly explained that, in the "special case" of "a temporary Presidential visit," "where flexibility must be maintained and there is insufficient time to publicly designate restricted areas by regulation," "knowing and willful entry or presence in a posted, cordoned off, or otherwise restricted area is made unlawful." *Id.* The fact that the Senate Report described what must be "knowing and willful" as the entry into the restricted area—but made no reference to a protectee's visit—strongly and singularly supports the view that the federal-protectee requirement was not subject to the mens rea requirement.

Further, Congress's concern with balancing "Presidential protection and individual liberty," and ensuring that the scope of unlawful behavior is clearly defined, S. Rep. 91-1252 at 8-9, supports rather than alters this conclusion. The most "rational way of predicting whether one's activities were actually violating the law" is to require knowledge that the area is "posted, cordoned off, or otherwise restricted." 18 U.S.C. § 1752(c)(1). Once a defendant has that knowledge, requiring the defendant to also know that a federal protectee is in the area adds no additional certainty. *See Feola*, 420 U.S. at 685 (failure to require knowledge that victim is a federal officer is not a "snare for the unsuspecting" because the defendant "nonetheless knows from the very outset that his planned course of conduct is wrongful"). In fact, an individual's knowledge of whether a federal protectee is present is rife with *un*certainty. Again, as Congress itself recognized, a federal protectee may frequently change locations, and the clearest way "to make such restricted areas known to the public" is by "posting or cordoning off"—regardless of whether it is communicated that a federal protectee is present. *Id.* at 9. *Groseclose* also correctly emphasized the fact that, just as in *Feola*, "'almost everything proscribed [under Section 1752] [was already] outlawed in some form or other at the State or local level.'" *Groseclose*, at 17 (quoting S. Rep. 91-

1252, at 9); *see also id.* ("'Subsection (a) makes these activities a Federal offense so that the Secret Service has the authority to prevent such activities.'"). Furthermore, to the extent a comparison between penalties is meaningful under *Feola* (*but see supra*), *Groseclose* observed that "the original penalty for violating § 1752 was capped at six months' imprisonment, *see* 18 U.S.C. § 1752(b) (1970)," which is consistent with the maximum "penalty commonly leveled against ordinary trespassers, *see, e.g.*, D.C. Code § 22-3302," and the maximum penalty for "those who disrupt congressional proceedings during the normal course of business when no Secret Service protectee is visiting, *see* 40 U.S.C. § 5109(b)." *Id.*

In sum, Section 1752's history demonstrates that the federal protectee requirement is jurisdictional, and Congress did not intend to extend scienter to that requirement. If anything, the foregoing historical analysis is significantly more conclusive than the limited historical evidence the Court found dispositive with respect to Section 111 in *Feola*.

> **b.    Congress's Modest Amendments in 2006 Did Not "Reconceptualize[]" Section 1752, and *Groseclose*'s Contrary Conclusion is Unpersuasive.**

As discussed, *Groseclose* correctly framed the issue in jurisdictional terms, and correctly found the pre-2006 version of 1752 analogous to Section 111 in all respects relevant under *Feola*. Nonetheless, *Groseclose* viewed Congress's 2006 amendments as a dispositive "reconceptualiz[ation]" of Section 1752 that transformed the federal-protectee requirement from jurisdictional to substantive. That conclusion is incorrect, and none of the considerations identified in *Groseclose* as supporting it is persuasive.

At the outset, *Groseclose* references (at 8) the fact that Congress "redraft[ed] the statute to place the three triggering conditions into the definitional section." It is not clear how much analytical weight *Groseclose* attached to that observation, but, regardless, the observation is both

incorrect and unavailing. The 2006 enactment did not move "the three triggering conditions" (*i.e.*, the conditions now in Section 1752(c)(1)(A) to (C)) into any "definitional section." *See* 18 U.S.C. § 1752 (2006). In fact, that definitional section (18 U.S.C. § 1752(c)(1)) was not enacted until 2012. *See* Pub. L. 112-98, § 2, 126 Stat. 26 (Mar. 8, 2012). As relevant here, the 2006 amendments simply (i) added a new subsection (then-numbered 1752(a)(2)) criminalizing trespass in areas restricted in connection with "National Special Security Events (NSSEs) … that occur when the Secret Service protectee is *not* in attendance," H.R. Conf. Rep. No. 109-133 (2006) (emphasis added), 2006 U.S.C.C.A.N. 184, 203; and (ii) increased the baseline statutory maximum from 6 months to one year. *See* Pub. L. No. 109-177, § 602, 120 Stat. 192 (Mar. 9, 2006). In any event, chronological errors aside, it is not clear—nor does *Groseclose* explain—why the relocation of certain elements to a separate definitional section would transform the federal-protectee requirement from jurisdictional to substantive.

Next, *Groseclose* observes that, in 2006, Congress increased the maximum penalties for 1752 from six months to one year, and points to legislative history suggesting that Congress did so to bring the penalties in line with the penalties for interfering with Secret Service personnel generally (18 U.S.C. § 3056). *Groseclose*, at 18. This minor change, in *Groseclose*'s view, transformed the character of the statute from "duplicating state prohibitions to confer federal jurisdiction" to "an *aggravated* offense leveling an added penalty against those who endanger Secret Service protectees," seemingly by transmuting Section 1752 into a "anti-obstruction provision" (*i.e.*, a provision focused on protecting against acts targeted specifically at the Secret Service's function), in which the defendant's knowledge of the federal protectee's presence essentially is a proxy for specific intent to impede the Secret Service's enforcement activities. *Id.* at 18-19. This theory misconstrues both the *Feola* inquiry and the 2006 amendments.

Begin with *Feola*. In *Feola*, too, the maximum penalties imposed by Section 111's predecessor (three years) were "harsher … than [was] typically imposed for" the corresponding unaggravated state-law crime (there, "unarmed assault on a private citizen"). 420 U.S. at 702 (Stewart, J., dissenting). Further, in *Feola*, too, the penalties were out of line with the comparable federal assault offenses based on a different federal nexus (*i.e.*, federal assault within the admiralty, maritime, or territorial jurisdictional of the United States). *Id.* at 703 (Stewart, J. dissenting). Indeed, the *Feola* dissenters pointed to these very penalty features as grounds to require knowledge of the officer-victim's federal status. The Court, however, found the opposite, determining that Section 111's officer-victim requirement was jurisdictional and did not require scienter. The same outcome must follow here, where the penalty discrepancies with comparable statutes are, if anything, much less significant than in *Feola*.

*Groseclose*'s reliance on Section 1752's 2006 amendments is also unconvincing. As relevant here, the 2006 amendments (i) expanded Section 1752(a)'s reach to include certain events regardless of the presence of a Secret Service protectee; and (ii) increased the maximum penalties for Section 1752 violations by six months. Pub. L. 109-177, § 602, 120 Stat 192 (Mar. 9, 2006). By their plain terms, neither of these changes purported to change the mens rea applicable to the location or federal-protectee requirements. Yet *Groseclose* finds that, rather than expressly amend the mens rea—as it did with other aspects of the statute—Congress made an equally (if not more) significant change to the statute in an oblique way: by changing a different aspect of the statute (the penalties). Congress knew how to change the statute in 2006, and it did. If it had wanted to change the mens rea, it could have done so explicitly, just as it did with other amendments introduced in 2006, and as it did with the 2012 amendments. It did not. Against this backdrop, *Groseclose*'s conclusion that a minor penalty enhancement—whose justification makes no

mention of a change to mens rea—nonetheless "reconceptualized" the statute and obliquely and dramatically amended the mens rea is strained.

Contrary to *Groseclose*'s implication*, moreover, increasing the maximum penalty to one year did not render Section 1752 disproportionately harsher than its state-law counterparts. *Groseclose* observes that the District of Columbia generally sets a statutory maximum of six months for unaggravated trespass, whereas the 2006 amendments increased the statutory maximum for unaggravated violations of Section 1752(a) to one year. *Groseclose*, at 17 (citing D.C. Code § 22-3302)). But *Groseclose*'s comparative reasoning is flawed.  For one thing, a maximum penalty of one year for trespass is comparable to the penalties imposed for similar conduct in, for example, Virginia, where the offenses of "trespass after having been forbidden to do so" and "trespass on posted property" are punishable for up to 12 months in jail. *See* Va. Code Ann. § 18.2-119 (making "[t]respass after having been forbidden to do so" a "Class 1 misdemeanor"), § 18.2-134 (making "[t]respass on posted property" a "Class 1 misdemeanor"), § 18.2-11(a) (Class 1 misdemeanors punishable by up to twelve months in jail). For another, the trespass conduct proscribed under Section 1752(a)(1) is, by definition, limited to areas that are "posted, cordoned off, or otherwise restricted"; as such, it is—and should be treated as—a more aggravated form of trespass than unaggravated forms of trespass involving, say, certain open lands. *See, e.g.*, Va. Code Ann. § 18.2-132 (making "[t]respass by hunters and fishers" on "the lands, waters, ponds, boats or blinds of another" a "Class 3 misdemeanor"), § 18.2-11(c) (Class 3 misdemeanors punishable by a fine of not more than $500). Finally, unlawful entry and remaining is not the only type of conduct that Section 1752(a) criminalizes. Section 1752(a) also criminalizes, in a nearby subsection, "knowingly engag[ing] in any act of physical violence against any person or property" within a restricted area. 18 U.S.C. § 1752(a)(4). It is therefore not disproportionately

harsh that Congress ultimately imposed a statutory maximum (one year of imprisonment) that allows for appropriate punishment of such violent conduct as well. By overlooking these features, *Groseclose*'s penalty comparison mixes apples and oranges.

*Groseclose* also reads too much (at 18-19) into a statement in the Conference Report accompanying the 2006 amendments explaining that Section 1752's statutory maximum penalties were increased "to make the penalty consistent with the prescribed penalty under 18 U.S.C. § 3056(d) (interference with Secret Service law enforcement personnel generally)." H.R. Conf. Rep. 109-333, at 110. Based on that sentence, *Groseclose* deduces that, if the post-2006 version of Section 1752 also served some anti-obstruction functions, the mens rea required of Section 1752 must be the same as the mens rea required for Section 3056—that similar mens rea being that the violator "know that, in some sense, he is endangering the Secret Service and their protectee." *Groseclose*, at 19. This reasoning misapprehends both *Feola* and Section 1752's history.

Begin, again, with *Feola*. *Groseclose*, as noted, relies heavily on *Feola*'s observation that if the statute at issue in that case (18 U.S.C. § 111) was "seen primarily as an anti-obstruction statute, it is likely that Congress intended criminal liability to be imposed only when a person acted with the specific intent to impede enforcement activities." 420 U.S. at 678. But *Feola* also observed that, at the other end of the spectrum, "[i]f [Section 111's] primary purpose [wa]s to protect federal law enforcement personnel, that purpose could well be frustrated by the imposition of a strict scienter requirement." *Id.* Faced with Section 111's dual purpose, *Feola* did not break the tie in favor of requiring the highest mens rea consistent with any of the statute's purposes. *Feola* did the opposite. Having found that Section 111 was "intended to protect both federal officers and federal functions" and that "furtherance of the one policy advances the other," *Feola* opted for "*rejecti[ng]* . . . [the] strict scienter requirement" and imposing the lesser mens rea requirement,

which was "consistent with both purposes." *Id.* (emphasis added). *Feola*'s upshot is clear: when a statute serves two important congressional purposes and one of those purposes weighs in favor of deeming a federal-nexus element jurisdictional, it is of no moment that the other statutory purpose could be served with a more stringent mens rea requirement. What matters is that only rejecting the stricter mens rea requirement honors both of Congress's purposes.

So, too, here. Assume for a moment that, when the 2006 amendments increased the maximum penalties for Section 1752 to one year, Congress really did intend to silently tinker with Section 1752's substantive prohibitions—including the statute's preexisting prohibitions—to serve a new anti-obstruction function. Still, nothing in the 2006 amendments or the legislative history suggests that Congress intended, at the same time, to affirmatively withdraw from Section 1752 its key pre-2006 function: protecting Secret Service protectees and Secret Service officers. With Congress' dual purposes in focus, the result follows from *Feola*: because, even after 2006, Congress still "intended to protect" not only "federal functions" but also Secret Service protectees and officers, and because "furtherance of the [latter] policy advances the [former]," "[t]he rejection of a strict scienter requirement is consistent with both purposes." 420 U.S. at 678.

In addition to misapplying *Feola*, *Groseclose*'s reliance on the 2006 amendments overlooks the most logical explanation for Congress' decision to increase Section 1752's maximum penalties. Perhaps Congress simply felt that it was incongruous to punish acts of trespass (*see* 18 U.S.C. § 1752(a)(1)), disorderly conduct (*see* 18 U.S.C. § 1752(a)(2)), and acts of physical violence (*see* 18 U.S.C. § 1752(a)(4)) that happened to take place within the President's (or other protectee's) safety area by a maximum of six months, while acts of non-physical resistance or interference with a Secret Service official's duties could be punished by up to a year, even when no protectee is present. After all, Congress did not say it sought to make the "mens rea" for each

statute consistent, nor did it amend 1752's actus reus to similarly punish obstruction with Secret Service protectees.  The more logical explanation is that Congress meant what it said and nothing more: its aim was simply, as it said, "to make the penalty consistent," not to fundamentally reorient Section 1752.

The "reconceptualiz[ation]" perceived by *Groseclose* also gives rise to at least two other problems. *Groseclose* finds that an individual could only warrant the "enhanced" and "stiff" new penalty for Section 1752 if he or she knew that "he is endangering the Secret Service and their protectees." *Groseclose,* at 19.[3]  For one thing, it fails to account for the fact that, since *Feola*, a similar legislative evolution happened with respect to Section 111, and the increased penalties there did not alter the mens rea required pursuant to that statute. In 2002, the Federal Judiciary Protection Act, Pub. L. No. 107-273, § 11008(a), 116 Stat. 1758, increased the maximum sentences for violations of 18 U.S.C. § 111(a) and (b) from three years to eight years and from ten years to twenty years, respectively. Moreover, as part of the same 2002 law, Congress directed the Sentencing Commission to review and amend the guidelines applicable to violations of Section 111 to ensure they were "adequate to ensure punishment at or near the maximum penalty for the most egregious conduct covered by the offense." Pub. L. No. 107-273, § 11008(e). In response, the Sentencing Commission adopted Amendment 663, which became effective in 2004, and which increased the "official victim" enhancement under U.S.S.G. § 3A1.2 from three levels to six levels where the offense guideline is from Chapter Two, Part A. *See United States v. Curtis*, 799 F. App'x 639, 641 (10th Cir. 2020) (describing revisions to the Sentencing Guidelines). And yet, two

---

[3] *Groseclose* opines that the new penalty is really only appropriate for those who know that they are endangering Secret Service protectees, but its own mens rea would not serve that goal.  An individual could be oblivious to the fact that barely entering a restricted area somehow "endangers" a protectee, particularly where the restricted area is substantial and the area may simply be one that a protectee "would be" visiting later in the day.

decades later, *Feola*'s holding that a defendant need not know whether his or her victim is a federal officer remains good law. If increasing the penalties for violations of Section 111 by five years (or ten, for aggravated assault under Section 111(b)) did not create an expanded mens rea requirement for Section 111, there is no reason why a mere six-month increase should have done so with respect to Section 1752. It is simply too strained to think that Congress, without ever saying so, took indirect action to raise the mens rea requirements—narrowing the statute and jeopardizing enforcement[4]—by amending the statute's penalties and adding another category of offenses, all measures that broadened the statute and fostered enforcement. *Groseclose* identifies no other statute that has ever been "reconceptualized" in such a way.

*Groseclose*'s reliance on the Sentencing Guidelines is unavailing for similar reasons. *Groseclose* posits that the presence of a protectee is not "jurisdictional" in part because "the [Guidelines] offense is bumped by 2 levels if the trespass occurred at 'any restricted building or grounds' and by 4 levels if it happened 'at the White House or its grounds, or the Vice President's official residence or its grounds.'" *Groseclose*, at 14-15 (citing U.S.S.G. § 2B2.3). But, once again,

---

[4] As the government has noted previously, requiring knowledge of a protectee's presence significantly narrows enforcement. It is one thing to prove an individual's knowledge of the President's whereabouts, but another thing entirely to require that the government prove that the defendant is aware of other Secret Service protectees, such as spouses of visiting foreign dignitaries or the family members of a Vice President. It would also be difficult to show that a defendant knows that someone protected by the "Secret Service" is in an area—which *Groseclose* proposes as an alternative—as a dignitary's protectee status is not often known (aside for the President, Vice President, and some of their family members), and Secret Service agents are, generally, not readily identifiable to the public. Under *Groseclose,* a defendant breaching a restricted area and even committing an act of violence there (18 U.S.C. § 1752(a)(4)) escapes liability if he did not know, for example, that the Vice President's daughter was in the area, or that the parked cars of a motorcade indicated that someone being protected by the Secret Service (as opposed to some other agency) was there. Even in a case involving an area being visited by a more well known protectee, proving not just that a defendant trespassed and that the defendant knew an area was blocked off, but also that she or he actually knew why the area was restricted—in what is usually a misdemeanor case—could pose a challenge in many instances.

the same is true of Section 111. There, too, the Sentencing Commission, carrying out Congress's direction, has, since *Feola*, specifically increased the Guidelines for assaults on federal officers. *See supra*. Yet the existence of an official victim enhancement for assaults on federal officers has not changed the mens rea required for a violation of Section 111. Section 1752 should be treated no differently.[5]

*Groseclose* is also difficult to reconcile with other post-*Feola* cases in which courts, including the Supreme Court, have not applied mens rea requirements to elements that the courts deemed jurisdictional. Indeed, courts have declined to extend scienter to jurisdictional elements even where the jurisdictional element is directly, textually linked to the required mens rea. Consider, for example, 18 U.S.C. § 641, which makes it a crime to "embezzle[], steal[], purloin[ing], or knowingly convert[] to [one's] use or the use of another . . . any . . . thing of value of the United States." Presented with the mens rea question at issue here, courts, including the D.C. Circuit, have held that proof that "the statutory requirement that the stolen property in fact belonged to the Government was to lay the basis for federal jurisdiction and that the defendant's knowledge of the jurisdictional fact is irrelevant." *United States v. Jermendy*, 544 F.2d 640, 641 (2d Cir. 1976) (citing *Feola*); *see also United States v. Baker*, 693 F.2d 183, 186 (D.C. Cir. 1982) ("It is now well established that the statutory requirement that the stolen property belonging to the government merely furnishes the basis for federal jurisdiction and that defendant's knowledge of this jurisdictional fact is irrelevant.") (citing cases); *United States v. Crutchley*, 502 F.2d 1195,

---

[5] That the Guidelines do not dictate the meaning of Congress' enactments is not surprising. The Sentencing Commission "is a permanent body that can amend the guidelines each year" on the basis of, among other things, evolving empirical data. U.S.S.G. § 1A1.5. The meaning of federal statutes, in contrast, is ordinarily fixed at the time of enactment and does not change absent amendment. *See, e.g.*, *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1738 (2020) (courts "normally interpret[] a statute in accord with the ordinary public meaning of its terms at the time of its enactment.").

1201 (3d Cir. 1974); *United States v. Jeffery*, 631 F.3d 669, 675-76 (4th Cir. 2011); *United States v. Boyd*, 446 F.2d 1267, 1274 (5th Cir. 1971); *United States v. Sivils*, 960 F.2d 587, 595 (6th Cir. 1992); *United States v. Hicks*, 15 F.4th 814, 817 (7th Cir. 2021); *United States v. Denmon*, 483 F.2d 1093, 1094-95 (8th Cir. 1973); *United States v. Howey*, 427 F.2d 1017, 1018 (9th Cir. 1970); *United States v. Speir*, 564 F.2d 934, 938 (10th Cir. 1977) (en banc).

The same is true of 18 U.S.C. § 1361, which makes it a crime to "willfully injure[] or commit[] any depredation against any property of the United States." There, too, presented with the same mens rea question, courts have held that proof of knowledge that the property belongs to the government is not required. *See, e.g.*, *United States v. LaPorta*, 46 F.3d 152, 159 (2d Cir. 1994); *United States v. Krause*, 914 F.3d 1122, 1127 (8th Cir. 2019). Stealing what one knows to be public property, or destroying or damaging what one knows to be public lands or government property could be viewed, in some ways, as a more aggravated offense than doing such things without such knowledge—just like trespassing in a restricted area where one knows a protectee is or will be present. But, as the case law confirms, the fact that an element could arguably be conceived as aggravating in some way is not enough to displace its jurisdictional status for mens rea purposes.

The Supreme Court's decision in *United States v. Yermian*, 468 U.S. 63, 64 (1984), is also instructive. *Yermian* extended *Feola* to prosecutions under 18 U.S.C. § 1001, which, at the time, criminalized "[w]hoever, in any matter within the jurisdiction of any department or agency of the United States[,] knowingly and willfully" made false statements, among other conduct. *Id.* at 68. The Court concluded that a defendant need not know that the false statement concerned a matter under federal jurisdiction, finding its reading supported by "plain language"—because the statute did not include an express requirement that the defendant know that the matter was within

federal jurisdiction—and by the absence of support in the legislative history for such a reading. *Id.* at 68, 75.

Nor can *Yermian*'s outcome be discounted because, in the version of 18 U.S.C. § 1001 at issue in *Yermian*, the federal-nexus requirement preceded (as opposed to followed) the word "knowingly." In considering the parties' arguments, the *Yermian* Court also considered an earlier version of the statute that tracked the same structure of Section 1752. *See* 468 U.S. at 72 (quoting Act of June 18, 1934, ch. 587, 48 Stat. 996, which criminalized "[w]hoever shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make . . . . any false or fraudulent statements or representations, . . . in any matter within the jurisdiction of any department or agency of the United States"). The Court found that language "equally clear," *id.* at 69 n.6, reasoning that "[n]oticeably lacking from this enactment is any requirement that the prohibited conduct be undertaken with specific intent to deceive the Federal Government, or with actual knowledge that false statements were made in a matter within federal agency jurisdiction." *Id.* at 72-73; *see also id.* at 69 n.6 (observing that "[t]he jurisdictional language of that provision appeared as a separate phrase at the end of the description of the prohibited conduct"). The same logic applies here.

Finally, *Groseclose* dismisses the government's argument that extending the mens rea to the federal-protectee requirement is not necessary to separate culpable from innocent conduct as "flip[ping] the rules of statutory interpretation on their head" (*Groseclose*, 10), suggesting that this principle only applies when a statute is silent on mens rea or when the text is ambiguous. But as cases applying *Feola* show, courts examine the line between culpable and innocent conduct as part of their analysis when determining whether a statute is "jurisdictional only," including for statutes that do include an express mens rea. *See, e.g., Jeffery*, 631 F.3d at 677 (determining that

requirement that property belong to "the United States" in prosecution under 18 U.S.C. § 641 was "jurisdictional only," following *Feola* because, regardless of knowledge of the property's ownership, Jeffery's "conduct was nonetheless wrongful, because he took something that did not belong to him"); *United States v. Allen*, 788 F.3d 61, 69 (2d Cir. 2015) (in statute criminalizing "willfully" setting fire to federal land, observing that "[a]rson is hardly otherwise innocent conduct" and declining to require knowledge that the land is federal). To the extent it is necessary to resolve any lingering ambiguity, the same approach would be appropriate here.[6]

### 2. Even if Not Jurisdictional, Section 1752 Does Not Require a Defendant to Know Why an Area is Restricted.

Even if this Court disagrees that the criteria for a restricted area are jurisdictional within the meaning of *Feola*, Section 1752 still does not require a defendant to know why an area is restricted because, where, as here, "the modifier 'knowingly' introduces a long statutory phrase, . . . questions may reasonably arise about how far into the statute the modifier extends." *Rehaif*, 139 S. Ct. at 2196.

Here, the facts that constitute the offenses, and that criminalize otherwise innocent conduct, include that a defendant knew he was in (or for purposes of Section 1752(a)(2), "within such proximity to") a "posted, cordoned off, or otherwise restricted area." 18 U.S.C. §§ 1752(a)(1), (2), (4); *see* 3 Wayne R. LaFave, Substantive Criminal Law § 21.2(c) (3d ed. 2022) ("[T]he common requirement of criminal trespass offenses is that the actor be aware of the fact that he is making an unwarranted intrusion, which serves to exclude from criminal liability both the inadvertent

---

[6] *Groseclose* also invoked, in passing, the rule of lenity. *Groseclose*, at 20. But the rule of lenity applies only if, "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *United States v. Castleman*, 572 U.S. 157, 172-73 (2014) (citation omitted); *see Shular v. United States*, 140 S. Ct. 779, 789 (2020) (Kavanaugh, J., concurring). And for the reasons above, no such grievous ambiguity exists here.

trespasser and the trespasser who believes that he has received an express or implied permission to enter or remain.") (quotation marks omitted).

There are good reasons to believe that Congress did not intend to require a defendant to know why a particular area is restricted. First, like jurisdictional elements, these requirements "have nothing to do with the wrongfulness of the defendant's conduct"—a touchstone that courts look to in determining how far scienter reaches, even where the word "knowingly" appears in the statute's language. *Rehaif*, 139 S. Ct. at 2196. A defendant who enters an area he knows to be restricted has engaged in wrongful conduct regardless of whether he knows the area is restricted because, for example, a former First Lady or a "distinguished foreign visitor[] to the United States" is present. 18 U.S.C. § 3056(a)(3), (6).

Second, such a requirement would run contrary to Congress's intent in enacting a statute designed to safeguard the President and other Secret Service protectees. If the statute requires the Secret Service to inform people that a protectee is present, that would tend to make the person less safe, not more. It would make no sense for Congress to require such a result given the "overwhelming[ ] interest in protecting the safety of [the] Chief Executive." *Wood v. Moss*, 572 U.S. 744, 758 (2014) (quotation marks omitted). *See generally United States v. Morgan*, 45 F.4th 192, 206 (D.C. Cir. 2022) (explaining that "the ordinary textual understanding of the operation of the word 'knowingly' in criminal statutes . . . is 'a contextual one,' subject to being overcome") (quoting *Flores-Figueroa v. United States*, 556 U.S. 646, 652 (2009)).

Third, requiring that a defendant know the reason an area is restricted is difficult to square with Congress's elimination of the statute's requirement that the defendant act "willfully," which occurred in 2012. That change was meant to "correct and simplify" the statute, and to "clarif[y]" that the penalties in Section 1752 of title 18 apply to those who knowingly enter or remain in any

restricted building or grounds without lawful authority to do so." H.R. Rep. No. 112-9, at 1-2. When it eliminated the statute's "willfully" requirement, Congress moved the language "any posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting" from § 1752(a)(1) to a separate definitional provision. *Compare* 18 U.S.C. § 1752(a)(1) (2011)*, with* 18 U.S.C. § 1752(a)(1) (2023). Nothing in this statutory amendment suggests that Congress meant to require a defendant to know why an area is posted, cordoned off, or otherwise restricted. To the contrary, by eliminating the statute's requirement that a defendant act willfully and moving the relevant language to a separate statutory section, Congress made clear its intent to lower the bar for prosecutions under § 1752. *See Feola*, 420 U.S. at 678 ("If the primary purpose is to protect federal law enforcement personnel, that purpose could well be frustrated by the imposition of a strict scienter requirement.").

Imposing the mens rea term of "knowingly" on the entire definitional provision in subsection (c) also invites more questions than it answers. Subsection (c)(2), for example, makes additional references to other sections of the U.S. Code that are carried into the definitional subsection by reference. *See* § 1752(c)(2) ("the term 'other person protected by the Secret Service' means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection"). By the defendant's logic, knowingly should also apply to those referenced sections— including knowledge that the person has not declined Secret Service protection—despite the grammatical – and logical – unwieldiness of such a construction. Congress cannot have intended that result.

a. ***Elizalde* was wrongly decided**

*United States v. Elizalde*, No. 23-cr-170 (CJN), 2023 WL 8354932 (D.D.C. Dec. 1, 2023) should not change the Court's conclusion. *Elizalde*, however, does not address the threshold dispositive question: whether the protectee's presence is a "jurisdictional" requirement under *Feola*. Accordingly, even if *Elizalde*'s analysis were correct with respect to the arguments that *Elizalde* discusses, the defendant's claim would still fail. This Court therefore need not reach the arguments discussed in *Elizalde*.

In any event, *Elizalde*'s analysis is unpersuasive. *Elizalde* rejected the government's reading mainly because, in Judge Nichols' view, that reading would require "restricted building or grounds" to bear two different meanings—that is, the statutory meaning for actus reus purposes, but a colloquial meaning for purposes of mens rea. 2023 WL 8354932, at *3. That is incorrect. There are not two different meanings of "restricted area" at play; the question is simply how much the defendant has to know to commit an offense. Here, *Morgan* is instructive. There, D.C. Circuit held "that, while section 2423(a) required proof that J.T. in fact was underage (under 18 for purposes of the knowingly clause and under 16 for purposes of the intent clause), the statute did not require proof that Morgan *knew* J.T. was underage." *Morgan*, 45 F.4th at 205 (emphasis added). But the D.C. Circuit did not thereby hold that the phrase "individual who has not attained the age of 18" had two different meanings (a person under the age of 18 for actus reus purposes and a person under the age of 16 for mens rea purposes). The same is true with regard to proof that a defendant is distributing a controlled substance in violation of the Controlled Substances Act: for *actus reus* purposes, the government can prove the substance is heroin, while for mens rea purposes, the government can prove that the defendant knew "only that the substance he is dealing with is some unspecified substance listed on the federal drug schedules." *See McFadden*, 576 U.S.

at 192. This divergence does not mean that the term "a controlled substance" means two different things.

In justifying its analysis, the *Elizalde* court speculated that "Congress may well have acted cautiously to avoid sweeping up conduct that poses little threat to a Secret Service protectee." 2023 WL 8354932, at *5. According to the court, it seemed "unlikely that someone who ends up near a Secret Service protectee by happenstance, without knowing that the protectee is present, is there to cause the protectee harm." *Id.* But no defendant could be successfully prosecuted having simply ended up near a protectee by "happenstance"; rather, he would have to knowingly enter a restricted area with full knowledge that he had no authority to be there. As the events of January 6 illustrate, such conduct does indeed threaten the protectee, regardless of whether the government can prove specific knowledge that the protectee is present. This is all the more true when considering other prongs of the statute, which criminalize acts of violence and disorderly conduct intended to disrupt government business, for example. *See* 18 U.S.C. §§ 1752(a)(2), (4).[7]  It is hard to see how such actions do not threaten a protectee, even where a defendant lacks specific knowledge of that individual's presence.

*Elizalde* also overstates "the clarity of the text." *Elizalde*, 2023 WL 8354932, at *5. As *Rehaif* explained "questions may reasonably arise about how far into the statute the [knowingly] modifier extends," and it does not travel at all to, for example, jurisdictional requirements. *Rehaif*, 139 S. Ct. at 2196. This is plainly such a case, yet *Elizalde* ignores this complexity. *Elizalde* offers

---

[7] For example, imagine a scenario where an armed aggressor mistakenly believes that the Speaker of the US. House of Representatives – not a designated protectee under Section 1752 – is at an airport hangar converted into a restricted area, and intends to trespass into the restricted area. But, as it turns out, the person present at the hangar is not the Speaker, but the Vice President. The risk from the armed aggressor, who might shoot before finding (or realizing the absence of) his intended target remains the same, and the *Elizalde* opinion provides no fact-based reason to equate knowledge of a protectee's presence with risk of harm.

up the basic example, "Smith knowingly transferred the funds to the account of his brother," and explains that "we all understand" that Smith "knew the account was his brother's." *Elizalde*, 2023 WL 8354932, at *3.. But in this example, it is not at all clear that "transferring the funds" demarcates culpable from innocent conduct. And just a small tweak would raise serious questions about the requisite knowledge: "Smith knowingly embezzled the funds from the account of the United States," a sentence resembling a violation of 18 U.S.C. § 641 – where no knowledge that the property is federal is required. The point is that the "textual" clarity that *Elizalde* uses as a justification to ignore all contrary indications of congressional intent is, on closer scrutiny, illusory. *Elizalde*'s foundation of "plain meaning" is not the solid foundation it purports to be. Instead, the reach of "knowingly" in Section 1752 is an open and debatable question – a question properly answered through consideration of all indicia of meaning.

For the reasons previously discussed, § 1752's text, structure, and context support the conclusion that Congress intended to require that a defendant know he was entering or remaining in a "posted, cordoned off, or otherwise restricted area"—words that immediately follow "knowingly" when the definition of "restricted building or grounds" is inserted—but not to know why the area was restricted.

*Remainder of Page Intentionally Left Blank*

\*      \*      \*

### 3. The Defendants Were Aware that the Vice President Would Be at the Capitol.

Although the government has not yet rested, the Court has already seen substantial evidence that these Defendants were aware that and understood why Vice President Michael Pence would be visiting the Capitol on January 6, 2021. *See, e.g.,* Govt Ex. 518 at 544, 559; Ex. 543; Ex. 581. Thus, even under a heightened knowledge requirement, the trial evidence will still support convictions under Section 1752.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

BY:  /s/  *Ashley Akers*
ASHLEY AKERS
Trial Attorney
Capitol Siege Section
MO Bar No. 69601
601 D Street, N.W.
Washington, D.C. 20530
202-353-0521
Ashley.Akers@usdoj.gov

SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20530
Samantha.Miller@usdoj.gov