### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**HENRY PHILLIP MUNTZER,**<br>**also known as "Hank Muntzer"**<br><br>**Defendant.** | **Case No. 21-cr-105 (JMC)** |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court depart or vary upwards from the applicable 27-33 month U.S. Sentencing Guidelines range to sentence Henry Phillip Muntzer to 54 months of incarceration, 36 months of supervised release, $2,000 in restitution, and a mandatory assessment of $270.

### I.    INTRODUCTION

The defendant, Henry Muntzer, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

In the weeks leading up to January 6, 2021, Muntzer—who considered any attempt to certify the results of the 2020 presidential election to be tantamount to treason—called for others to join him in traveling to Washington, D.C., to engage in a battle of "Good vs. Evil" and paid for eight people to fly to Washington, D.C. After attending President Trump's speech at the Ellipse, Muntzer then walked with his group to the Capitol—including a ten-year-old boy—where he recorded videos saying that he was "taking the Capitol by storm." After entering the Capitol building, Muntzer repeatedly joined the mob's efforts to push past police lines, both in the hallway outside the Old Senate Chamber and in the Rotunda. Even as police officers worked to clear the Rotunda, Muntzer's resistance was so intense that he was ultimately one of the vary last rioters forced out. Since January 6, 2021, Muntzer has consistently refused to take responsibility for his actions and instead has championed them, stating to the press that "look[ing] back at history … January 6 will be our new Fourth of July." He has stated his willingness to engage in similar actions in the future, saying that he "would absolutely want to be there again" because "it was the greatest time … to be alive."

A 54-month sentence reflects the gravity of Muntzer's conduct, particularly in light of his continued lack of remorse, his repeated attempts to push against police lines in multiple locations within the Capitol, and his open disdain for pretrial supervision.

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the statement of facts supporting the criminal complaint filed in this case, ECF No. 1, for a summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.     Muntzer's Role in the January 6, 2021 Attack on the Capitol

<u>*Muntzer's Statements Before January 6*</u>

In the months leading up to January 6, 2021, Muntzer became increasingly frustrated with the outcome of the 2020 presidential election. During this time, he frequently took to social media to state that Donald Trump had won the election and that any attempt to certify Joe Biden's electoral victory would be fraudulent and treasonous. For example, on December 4, 2020, he posted to Facebook that "[o]nce the real ballots are counted everyone will understand that [Trump] won 49 states … in short time the evidence will bear it out. How will those who have been lied to for so long handle it?" Trial Ex. 301.2.

During this period, Muntzer closely followed legal challenges to the election results and was aware of the significance of Congress's certification of the Electoral College vote on January 6, 2021. *See, e.g.,* Trial Ex. 301.4 ("Today the Supreme Court would not hear the lawsuits of Texas and the other states about the illegal voting."). Muntzer expressly equated the certification of the election results to treason. On December 7, 2020, Muntzer explained his view on Facebook: "[I]t was necessary to allow the states to certify the election not only because it's fraud but it's treason.

What good would it be to expose the fraud to catch a few when you can catch em all…" Trial Ex. 301.3

As time went on, Muntzer's rhetoric escalated. He began to express a desire and willingness to fight to stop the certification of the Electoral College vote from taking place. On December 28, 2020, he posted to Facebook about his planned trip to Washington, D.C., saying, "we are coming, and we are one pissed off group. We would rather die on our feet and be free than to live on Our Knees as a slave." Trial Ex. 301.6. Over the next few days, he continued to echo the importance of showing up *en masse* on January 6, at one point evoking the imagery of a swarm of bees: "The secret to defeating your enemy is to show up in masses. You see when you surround your enemy with such overwhelming force, you can defeat your enemy without even firing a shot." Trial Ex. 301.8.



*Image 1: Trial Exhibit 301.7*

In fact, Muntzer was so determined to see a large crowd gather on January 6, 2021, in support of former President Trump, that he even offered to pay for others to travel with him from

Montana to Washington, D.C. *See* Trial Ex. 301.5. And Muntzer did, in fact, end up paying for approximately eight other Montanans' flights to Washington. Trial Tr. 2/6/2024 at 22.

Just two days before January 6, 2021, Muntzer's violent rhetoric escalated even further when he posted that "Vice president Mike Pence is a traitor and will face execution." Trial Ex. 301.11.

### *Muntzer's Statements and Actions on January 6*

Muntzer traveled from Montana to Washington, D.C., on January 5, 2021 with a group. The next day, he attended the "Stop the Seal" rally at the Ellipse with the group, where he listened to President Trump's speech. After the speech ended, Muntzer and his group joined the crowd in walking from the Ellipse to the Capitol. Along the way, Muntzer was informed by a rioter next to him that "my wife is saying they are breaking down the fences in front of the Capitol and are pepper spraying everybody . . . it's happening now." Muntzer replied, "Well you know it's the people's house, we just move in and spend the night down there . . . take it over." Trial Ex. 219.

On January 6, Muntzer approached the Capitol from the west, entering the restricted Capitol perimeter and reaching the West Plaza. After other rioters breached the scaffolding at the West Plaza's north side, Muntzer joined the mob in surging up the Northwest stairs before reaching the Upper West Terrace by approximately 2:35 p.m. There, Muntzer recorded multiple videos in which he commented that he had passed "through all the tear gas" to "tak[e] the Capitol by storm." Trial Ex. 302.4; 302.5. These videos show rioters climbing on the scaffolding erected on the south side of the West Plaza, stepping over piles of construction equipment, and waving for other rioters to join them behind the fallen police line. Muntzer also testified at trial that he was pepper sprayed while in this area. Trial Tr. 2/6/2024 at 33.

Muntzer then entered the Capitol building through the Upper West Terrace Door at approximately 2:44 p.m. A loud fire alarm blared in that area.



*Image 2: Screenshot from Trial Exhibit 102.2 (Muntzer circled in yellow)*

Muntzer then proceeded to the heart of the Capitol building, walking through the Rotunda and toward the Senate Chamber. Once inside, he was involved in a series of physical confrontations with officers. First, before he could reach the Senate Chamber, Muntzer and a group of other rioters encountered a police line blocking their path, just past the Old Senate Chamber. At approximately 2:47 p.m., the crowd of rioters—including Muntzer—began pushing the police line back down the hallway and toward the Senate. *See* Trial Ex. 103.2, 103.10. The police ultimately regained control of the hallway after forcibly pushing back the crowd of rioters. Body-worn camera footage, seen below, depicts one officer placing his hand on Muntzer and attempting to move Muntzer back as the police reestablished their line.



*Image 3: Screenshot from Trial Exhibit 103.10 (Muntzer circled in yellow)*

After the police regained control of the path to the Senate Chamber by deploying pepper spray, Muntzer returned to the Rotunda by approximately 2:55 p.m. He briefly walked through a hallway leading toward Statuary Hall and the House Chamber, but quickly returned to the Rotunda by 2:57 p.m. There, Muntzer joined a crowd of rioters confronting a group of police officers blocking a doorway leading out to the Capitol's Upper West Terrace. It appeared that some of the rioters believed that the entrance led to a path to Speaker Pelosi's office. Muntzer positioned himself at the front of this crowd and joined in a collective effort to push back the officers—who had their backs to a set of stairs. *See* Trial Ex. 208, 210. At trial, one of the officers blocking this doorway—MPD Officer Robert Varga—testified that at least one officer fell down the stairs because of these collective pushes. Trial Tr. 2/5/2024 at 97.



*Image 5: Screenshot of Trial Exhibit 210 (Muntzer circled in yellow)*

After failing to break the police line at the Rotunda archway, Muntzer moved to the center of the Rotunda. At this time, the police established a line across the middle of Rotunda and instructed rioters to exit through the East Rotunda Door, but they faced resistance from the mob. *See, e.g.,* Trial Ex. 103.9. Muntzer positioned himself at the front of the opposition, standing directly in front of the police line. From this position, Muntzer yelled and chanted at the line of officers, "USA, USA, USA!" and, when told to move back by the officers, Muntzer responded, "No, I won't do that." Muntzer then joined the crowd in collectively pushing against the police line.



*Image 6: Screenshot of Trial Exhibit 103.3 (Muntzer circled in yellow)*

From his position at the front of the crowd, Muntzer pushed against officers, refused to obey their commands to move back, and obstructed the police officers' attempts to clear the Rotunda. Video evidence shown at trial depicts multiple instances of police attempting to push Muntzer back from their line, but he repeatedly pushed back against their efforts and returned to his position at the front of the mob confronting the police.



*Image 7: Screenshot of Trial Exhibit 214 (Muntzer circled in yellow)*

Muntzer continued to resist police efforts to clear the Rotunda even as the police line advanced closer to the exit. He was ultimately one of the very last rioters forced out of the Rotunda on January 6.



*Image 8: Screenshot of Trial Exhibit 102.5 (Muntzer circled in yellow) at 3:18 p.m.*

After being pushed out of the Rotunda, Muntzer exited the Capitol Building through the Rotunda Doors on the Capitol's east side at 3:22 p.m. *See* Trial Ex. 102.4. In total, he spent approximately 38 minutes inside the Capitol building.

<u>*Muntzer's Statements and Actions After Leaving the Capitol*</u>

Almost immediately after leaving the Capitol grounds, Muntzer began describing that day's events and his activities in interviews with YouTubers, Trial Ex. 203, and in posts to his personal Facebook page. In one Facebook post from January 6, 2021, he described "storming the capital . . . get[ting] past the capital police and enter[ing] 4 chambers." Trial Ex. 301.12. That same day, while commenting on his exposure to chemical irritants, Muntzer posted that "the burning only made [him] more determined." Trial Ex. 301.14. And two days later, on January 8, 2021,

10

Muntzer explained in a Facebook post that every time police officers attempted to control the crowd by deploying chemical irritants, the police "lost ground and we pushed them further down the corridors." Trial Ex. 301.16.

Muntzer continued to be outspoken in the lead-up to his trial. On January 25, 2024, he spoke to KRTV, a local news station, to describe his role in the riot at the Capitol. *See* Trial Ex. 221. In that interview, Muntzer, wearing a shirt with his booking photo from his arrest in this case with the caption "Rockin' the Orange!", explained that "the reason why [he] was there was to keep Congress from committing treason, which they did anyways." He stated that "you're going to look back at history that January 6 will be our new Fourth of July." Muntzer also stated, "I do not regret being there. I would absolutely want to be there again . . . it was the greatest time, I believe, to be alive." *Id.*



*Image 9: Screenshot of Trial Exhibit 221*

And, just days before his trial was scheduled to begin, Muntzer gave another interview wherein he discussed his disregard for his conditions of release. Commenting on conditions limiting his gun rights, Muntzer stated, "you think if a war breaks out that I care that I'm not

supposed to handle a gun? Hell no. Not only will I get any guns I need, I'll take the guns off of them. So that won't stop it if there's ever a revolution." *Trial Ex. 224*.

Notably, Muntzer's social media posts in recent months have regularly described current political events in terms of war and revolution. For example, on February 18, 2024, Muntzer posted on Facebook, in part, "many are paying the price for jannuary 6. The only difference [is] we will not give up, even if we have to bring down the entire corrupt Government to do so." He continued, "We would rather die on our feet than live as slaves on our knees." He then falsely claimed the mob was "assembled peacefully" and that the police were aggressors.

<u>*Muntzer's False Statements at Trial*</u>

At trial, Muntzer chose to testify. However, this testimony was often untruthful and in direct conflict with the Court's findings.

For example, Muntzer testified at trial "They let us into the Capitol . . . Somebody waved us in. They opened the doors." Trial Tr. 2/6/2024 at 30, 33, 60, 57. The evidence presented at trial showed that this testimony was false. For example, Muntzer was aware that officers were using chemical irritants to try to disperse rioters from the Capitol grounds. In fact, he even recorded multiple videos in which he commented on the "tear gas" that was used, and, on cross examination, Muntzer admitted to being pepper sprayed while outside the Capitol. Moreover, the evidence clearly showed police officers attempted to block Muntzer and other rioters from reaching certain locations within the Capitol building, and, in the Rotunda, they battled with Muntzer to force him out of the building.

Muntzer also testified at trial, "I did not push anyone. That's very clear," "I wasn't pushing on police lines," and "I wasn't pushing against [the police officers]." Trial Tr. 2/6/2024 at 29, 67,

and 75. On direct, his counsel asked him, "Did you intend to offer any resistance to the guards [in the Rotunda]," and Muntzer responded, "No." Trial Tr. 2/6/2024 at 13. This is contrary to the video evidence presented at trial and the Court's verdict. *See, e.g.,* Trial Tr. 2/7/2024 at 8 ("video also shows Mr. Muntzer physically pushing back against officers.").

*Muntzer's Post-Trial Statements*

After the conclusion of trial, Muntzer continued to discuss this case and the events of January 6, 2021 on social media. On February 7, 2024, after receiving the Court's verdict, Muntzer wrote on Facebook, "This is a badge of honor" and "Would I do it again knowing what I knew then[,] absolutely."

These post-trial statements continue to double down on Muntzer's false allegations. On February 25, 2024, Muntzer posted a link to an article "Use Of Force Expert Says Capitol Police 'Set One Man On Fire' With Concussion Grenades on January 6." In his post, Muntzer wrote, in part, "It was the police and congress that created the trap an[d] assaulted us for a narrative."

Many of Muntzer's post-trial statements also focused directly on the Court and its personnel. On February 27, 2024, for example, Muntzer took to Facebook to decry the Court's rulings, claiming that he was "assaulted at the capital," but "The judge is trying to prevent me from releasing that information. This is criminal in nature."

And, in March 2024, Muntzer turned his attention to his Pretrial Services Officer. On March 6, 2024, the Dillon Tribune, Muntzer's local newspaper, published an interview with him regarding an alleged violation of his pretrial release. *Exhibit 1*. The article states, "Muntzer added the probation officer is part of the problem." *Id.* at 2. The article then quotes Muntzer as stating, "I'm about to expose her in a big way, and have her removed from representing anyone on Jan. 6

cases because of her bias." *Id*. Muntzer shared various grievances about this Officer on his Facebook page and even published photographs displaying her name and contact information on Facebook.

But Muntzer did not limit this commentary to his personal social media. Instead, he went to the press with his complaints about this Pretrial Services Officer. In an interview posted to YouTube on March 14, 2024, Muntzer accused the Officer of "violat[ing] [his] rights and [lying] under oath." *Exhibit 2*. Muntzer kept the Pretrial Officer's contact information on his public page, knowing that the officer would likely be doxxed. Only after this Court instructed him to do so did Muntzer delete his Facebook posts containing the Pretrial Services Officer's contact information.

## THE CHARGES

On January 18, 2023, a federal grand jury returned a superseding indictment charging Muntzer with six counts, including 18 U.S.C §§ 1512(c)(2), 2 (Obstruction of an Official Proceeding); 231(a)(3) (Civil Disorder); 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds), and 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds) and 40 U.S.C. §§ 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building) and 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building). On February 7, 2024, Muntzer was convicted of those offenses following a bench trial.

## I.      STATUTORY PENALTIES

Muntzer now faces sentencing on the charges listed above.

As noted by the Presentence Report issued by the U.S. Probation Office, the defendant faces the following maximum penalties for his offenses of conviction:

14

- <u>Count One (18 U.S.C. § 1512(c)(2))</u>: Up to 20 years of imprisonment, a term of supervised release of not more than three years, a term of probation of not less than one nor more than 5 years; a fine up to $250,000, restitution, and a mandatory special assessment of $100;

- <u>Count Two (18 U.S.C. § 231(a)(3))</u>: Up to 5 years of imprisonment, a term of supervised release of not more than three years, a term of probation of not less than one but not more than 5 years; a fine up to $250,000, restitution, and a mandatory special assessment of $100;

- <u>Counts Three & Four (18 U.S.C. §§ 1752(a)(1) and (2))</u>: For each count, up to one year of imprisonment, a term of supervised release of not more than one year, a term of probation of not more than 5 years; a fine up to $100,000, restitution, and a mandatory special assessment of $25; and

- <u>Counts Five & Six (40 U.S.C. §§ 5104(e)(2)(D) and (G))</u>: For each count, up to 6 months of imprisonment, a term of probation of not more than 5 years; a fine up to $5,000, restitution, and a mandatory special assessment of $10.

## II.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 49. "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.*

The government largely agrees with the draft PSR's Sentencing Guidelines calculations.

Count One: 18 U.S.C. §1512(c)(2)

| U.S.S.G. § 2J1.2 | Base Offense Level | 14 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | Adjusted Offense Level | 16 |

Count Two: 18 U.S.C. § 231(a)(3)

| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact | +3 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | Adjusted Offense Level | 15 |

The draft PSR has a typographical error for the Sentencing Guidelines calculation for Count Two. While it provided for a 2-level adjustment for obstruction of justice, it failed to add that adjustment in the Adjusted Offense Level (counting only 13 levels instead of 15). *See* PSR ¶¶ 62–64. The draft PSR also did not include the Guidelines calculations for each count, so the government includes those calculations below.

Count Three: 18 U.S.C. § 1752(a)(1)

| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A) | Restricted Grounds | +2 |
| *U.S.S.G. § 2B2.3(c)(1)* | *(§2X1.1(a) cross-reference to Count Two)* | |

| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact | +3 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | Adjusted Offense Level | 15 |

Count Four: 18 U.S.C. § 1752(a)(2)

| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact | +3 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | Adjusted Offense Level | 15 |

*Obstruction Enhancement under § 3C1.1*

Muntzer's false trial testimony should result in a two-point enhancement under U.S.S.G. § 3C1.1. Application Notes 4(B) and 4(F) to Section 3C1.1 state that "committing . . . . perjury" is one type of conduct to which the two-level obstruction enhancement applies, as is "providing materially false information to a judge." *United States v. Dunnigan*, 507 U.S. 87, 92-95 (1993). Whether Muntzer committed either type of conduct must be shown by preponderance of the evidence.[2] *See United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004) (citing *United States v. McCoy*, 242 F.3d 399, 407 n.14 (D.C. Cir. 2001)). The Court should make specific findings at sentencing as to each element of perjury: that Muntzer gave "false testimony concerning a material matter with the willful intent to provide false testimony." *Dunnigan*, 507 U.S. at 94.

Muntzer took the stand at trial and repeatedly committed perjury. As noted above, he made at least the following materially false statements: "[The police officers] let us into the Capitol . . . Somebody waved us in. They opened the doors" (Trial Tr. 2/6/2024 at 30), "I did not push anyone. That's very clear" (Trial Tr. 2/6/2024 at 29), "I wasn't pushing on police lines" (Trial Tr. 2/6/2024 at 67), and "I wasn't pushing against [the police officers]" (Trial Tr. 2/6/2024 at 75).

The Court's verdict confirms the falsity of Muntzer's claims. In its verdict, the Court stated,

---

[2] "At one time," the D.C. Circuit required proof of perjury for 3C1.1 purposes by clear-and-convincing evidence. *United States v. Makki*, 47 F. Supp. 2d 25, 29 n.3 (D.D.C. 1999) (citing *United States v. Montague*, 40 F.3d 1251, 1253 (D.C. Cir. 1994)). But the D.C. Circuit subsequently interpreted a 1997 amendment to the sentencing guidelines to mean that "such allegations could now be proven by a preponderance of the evidence." *United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004) (citing *United States v. McCoy*, 242 F.3d 399, 407 n.14 (D.C. Cir. 2001)). While *Montague* has not, to the government's knowledge, been expressly overruled, the government is not aware of it having been cited favorably in a perjury 3C1.1 case that involved the post-1997 guidelines. Of course, Worrell committed perjury under either standard of proof.

"I don't credit that Mr. Muntzer walked into the Capitol as a lost tourist" and "it would have been obvious from the officers' conduct toward the people in the Capitol building that he was not supposed to be there." Trial Tr. 2/7/2024 at 12, 15. The Court even highlighted a government exhibit that directly refuted Muntzer's statement on the stand that the officers let him. Trial Tr. 2/7/2024 at 12 (discussing a video of Muntzer walking to the Capitol where Muntzer was told "that the fences were being knocked down."). The Court also found Muntzer "did physically clash with law enforcement . . . [and Muntzer] used his strength to resist and push back." Trial Tr. 2/7/2024 at 13.

Thus, the two-point enhancement applies.

*Grouping*

The government agrees with the draft PSR's grouping analysis. Counts One, Three and Four group because they involve the same victim, Congress. U.S.S.G. § 3D1.2(b). Count Two involves a distinct group—the police officers inside the Capitol building against whom Muntzer repeatedly pushed. Pursuant to U.S.S.G. § 3D1.4, one unit is assigned to the group with the highest offense level (Group 1, Adjusted Offense Level 16) and one unit is assigned to a group that is 1 to 4 levels less serious (Group 2, Adjusted Offense Level 15). The combined adjusted offense level is therefore 18.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. The PSR correctly concludes that Section 4C1.1 does not apply in this case, PSR ¶ 70, because Muntzer repeatedly used violence and physical force to obstruct police officers. U.S.S.G. § 4C1.1(a)(3). Courts in this

18

district have interpreted "violence," for purposes of § 4C1.1, to include "the exertion of any physical force so as to injure or abuse." *See United States v. Bauer*, 21-cr-386-2 (TNM) (quoting Webster's Third New International Dictionary (1993)); *see also United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5. Muntzer's conduct at the Capitol satisfies this definition. The Court found beyond a reasonable doubt that Muntzer "used his strength to resist and push back" while "physically clash[ing] with law enforcement. Trial Tr. 2/7/2024 at 13. While in the Rotunda, Muntzer "repeatedly pushed himself to the front of the crowd" and "had face-to-face interactions and confrontations with officers" that included "physically pushing back against officers." *Id.* at 7–8. In fact, while in the Rotunda, Muntzer's attempts to push against police lines contributed to a police officer falling down a set of stairs, Trial Tr. 2/5/2024 at 97, according to the testimony of MPD Officer Robert Varga—which the Court "credit[ed] in full." Trial Tr. 2/7/2024 at 7. Simply put, group pushes against outnumbered police involve violence. The government is aware of multiple cases in which courts have rejected the application of § 4C1.1 to January 6 defendants who participated in collective pushes against police lines. *See, e.g., United States v. Giberson*, 23-cr-115 (CJN); *United States v. Reyher*, 23-cr-138 (RBW).

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[3]

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 56. Accordingly, based on the government's calculation of the defendant's total adjusted offense level at 18, and a criminal history score of 0, Muntzer's Sentencing Guidelines range is 27 to 33 months of incarceration.

## A.  Upward Departure or Variance

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Following *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024) the enhancements under U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2) no longer apply. But that decision does not undercut the severity of Muntzer's crime – that, to obstruct the electoral certification, he positioned himself at the front of the mob in multiple instances and tried to use physical force to overpower the outnumbered police force standing between him and Congress. And Muntzer's goal was no less than stopping the peaceful transfer of power; a goal that he and the mob succeeded in achieving for several hours, causing the evacuation of the entire Congress and the Vice President., *See Brock*, 94 F.4th at 59 ("interference with one stage of the electoral college vote-counting process . . . no doubt endanger[ed] our democratic processes and temporarily

---

[3] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

derail[ed] Congress's constitutional work"). In order to impose a just and fair sentence in this case, the Court should either (1) impose an upward departure pursuant to U.S.S.G. § 5K2.7, resulting in a sentence of 54 months' imprisonment, or (2) vary upwards to sentence Muntzer to 54 months' imprisonment, above his current Guidelines range but still within the pre-*Brock* Guidelines range.[4]

A "district court's authority to impose a departure emanates from 18 U.S.C. § 3553(b)(1) and, in turn, in Chapter 5, Part K of the Guidelines." *United States v. Jacobs*, 635 F.3d 778, 781–82 (5th Cir. 2011). This part of the Guidelines "identifies some of the circumstances that the Commission may have not adequately taken into consideration in determining the applicable guideline range," which may warrant a departure. U.S.S.G. § 5K2.0(a)(2)(A).

One such circumstance is when an offense results in "a significant disruption of a governmental function." U.S.S.G. § 5K2.7.[5] A departure under this guideline is warranted in "unusual" circumstances where the Guidelines do not reflect the appropriate punishment for the offense. *Id*. In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."

Although the general rule is that § 5K2.7 does not provide for an upward departure when the offense involves obstruction of justice, the obstruction of the Electoral College certification on

---

[4] The government's proposed 54-month sentence is below what Muntzer's guidelines range would have been pre-*Brock* if Muntzer had received the +3 enhancements for obstruction causing a substantial interference under 2J1.2(b)(2) and the +8 enhancement for conduct causing or threatening injury or property damage under 2J1.2(b)(1)(B). It is above what the range would have been if he had received the +3 enhancement alone, which is a fitting reflection of the fact that his obstruction involved three separate physical confrontations with the police.

[5] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

January 6, 2021 is the exact type of unusual circumstance that the Sentencing Commission could not have predicted and that warrants an upward departure. Those who obstructed the administration of justice that day targeted the peaceful transfer of power, one of the fundamental and foundational principles of our democracy. They were part of a mob that injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses. Defendants like Muntzer "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *Brock*, 2024 WL 875795, at *15. It was an unprecedented day in American history. But, following *Brock*, the seriousness of the crimes committed for defendants like Muntzer is not adequately captured by the applicable Guideline, § 2J1.2, because the Sentencing Commission did not contemplate that an event like January 6 could happen when it wrote the Guidelines. At least one Judge of this Court has already applied § 5K2.7 in a January 6 case. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours").

If the Court decides not to apply § 5K2.7, an upward variance is warranted to achieve an appropriate sentence under the § 3553(a) sentencing factors. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up).

Here, an upward variance is warranted to account for the unique nature and circumstances of the offense and to reflect the seriousness of the offense. As just discussed, Muntzer's obstruction

of justice on January 6 was a serious offense that attacked the fundamentals of American democracy. The only reason that Muntzer is not subject to eleven levels' worth of enhancements in § 2J1.2 is because the Sentencing Commission did not imagine that a day like January 6 could occur. As Judge McFadden stated in a pre-*Brock* sentencing hearing:

> Regardless of whether the 'administration of justice' language actually applies to this situation, *I have no doubt that the Commission would have intended for this to apply to substantial interference with an official proceeding like a certification process, which is itself more significant than almost any court proceeding…* [Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources.

*United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent'g Tr. 9/22/22 at 86-87 (emphasis added).

In the specific facts and circumstances of Muntzer's case, an upward variance to 54 months' incarceration is appropriate. *See United States v. Reffitt,* 21-cr-87 (DLF), Mem. Op. and Order 4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'); *United States v. Fonticoba*, 21-cr-368 (TJK), Sent'g Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *Fonticoba*, 4/11/2024 Mem. Order at 4-5 (denying motion for release pending appeal and agreeing that certification proceeding was "far more important" than "any run-of-the-mill" judicial or quasi-judicial proceeding). Accordingly, the government requests that the Court vary upwards and sentence Muntzer to 54 months' imprisonment, in order to give effect to "the concerns underlying

23

the Government's requests for these enhancements under the § 3553(a) factors at sentencing." *See United States v. Seefried*, 639 F. Supp. 3d 8, 20 (D.D.C. 2022).

## III.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Muntzer's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Muntzer was an active participant in the riot, repeatedly joining the mob in violently pushing against police lines and resisting attempts by the police to clear the Capitol building. And his intent was clear: to prevent Congress from certifying the election results—an act that Muntzer continues to describe as treason. The nature and circumstances of Muntzer's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 54 months incarceration.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Muntzer has no past criminal convictions. PSR ¶ 72–78. Muntzer has reported that he is in good physical and mental health and that he has no history of substance abuse. PSR ¶ 89–93. From 1999 to sometime after January 2021, Muntzer owned an appliance store, Appliance Doctor, Inc., in Dillon, Montana, but he is currently unemployed. PSR ¶ 97–98. Muntzer currently lives alone in Dillon, Montana. PSR ¶ 85.

Muntzer has not been fully compliant while on release. *See* PSR ¶ 11; ECF No. 83 (pretrial violation report). The Court held a hearing on Muntzer's violations of his conditions of release in March 2024 but ultimately did not revoke his bond. Muntzer has complied with his conditions of release since that time. *Id.* And, as described below in connection with the need for specific deterrence, Muntzer has been defiant and remorseless.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the January 6th riot. *See United States v. Cronin*, 22-cr-233 (ABJ), Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.") Muntzer's criminal conduct on January 6 was the epitome of disrespect for the law.

### C.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence therefore weigh strongly in favor of incarceration.

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs especially heavily in favor of a lengthy term of incarceration.

First, Muntzer's utter lack of remorse for his actions and his public statements to that effect even after being convicted at trial strongly suggest that, given the chance, Muntzer would engage in similar criminal conduct in the future. The court need not infer this tendency toward recidivism: Muntzer has said so himself. In his January 25, 2024, interview, he directly stated, "I do not regret being there. I would absolutely want to be there again . . . it was the greatest time, I believe, to be alive." And this was not an isolated incident. Muntzer's statements post-trial continue to discuss national politics in terms of a war between good and evil, with Muntzer stating that he has a duty and an obligation to *overthrow* the government, which he sees as tyrannical. Additionally, absent being incarcerated, Muntzer will not be deterred from possessing a firearm. *Trial Ex. 224* ("you think if a war breaks out that I care that I'm not supposed to handle a gun? Hell no."). This same

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

statement shows his unwillingness to follow the Court's rules and the law when they contravene what he thinks is best.[7]

Second, Muntzer has displayed a defiant and even threatening attitude toward the Court and pretrial services. Moments after being found guilty, Muntzer took to Facebook to decry the Court's ruling, claiming that he was "assaulted at the capital," but "The judge is trying to prevent me from releasing that information. This is criminal in nature." He also targeted his Pretrial Services Officer in his local newspaper and on Facebook. Muntzer called her "part of the problem," "bias[ed]," and that he would "expose her in a big way." Muntzer kept posts regarding his Pretrial Services Officer on his Facebook page which included her name and contact information.

The need for specific deterrence is especially strong here. Unhappy with the results of the 2020 presidential election, Muntzer traveled hundreds of miles from his home in Montana to Washington, D.C., joined a mob invading the Capitol, obstructed Congressional proceedings, and attacked officers. With the 2024 presidential election approaching, the potential for political violence remains. The Court must sentence Muntzer in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United*

---

[7] Muntzer genuinely believes war is a real possibility. For example, after the verdict, on February 18, 2024, Muntzer wrote on Facebook, in part, "It's our duty and our obligation to overthrow a tyrannical government. Remember, this is a war, not with bullets, but ideologies whether we remain free or slaves."

*States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means

28

that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[9] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Barnett,* 21-cr-038 (CRC), the defendant, who famously was photographed with his feet on a desk in Speaker Pelosi's office suite, was found guilty of felony

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

violations of 18 U.S.C. §§ 231(a)(3) and 1512(c)(2), as well as the felony versions of 18 U.S.C. § 1752(a)(1) and (2) because he carried a dangerous weapon—an electrified walking stick and a ten-pound metal flagpole. Barnett was sentenced to 54 months' incarceration. Barnett and Muntzer have many similarities. Like Muntzer, Barnett was vocal on social media in the weeks leading up the January 6, indicating that he was ready to fight to prevent President-Elect Biden from assuming office. Also like Muntzer, Barnett gave numerous interviews to the press following January 6, in which he boasted about his activities on January 6 and suggested that he would engage in similar criminal conduct in the future. Barnett did carry a walking stick that doubled as a stun gun and a heavy flagpole, but he did not physically engage with officers—let alone in three separate places, like Muntzer. Judge Cooper also gave Barnett credit at sentencing for being compliant with the terms of pretrial release. Muntzer, by contrast, has been non-compliant and defiant.

In *United States v. Clark*, 21-cr-538 (DLF), the defendant was found guilty of felony violations of 18 U.S.C. § 1512(c)(2), as well as various misdemeanor charges after a stipulated trial and was sentenced to 33 months' incarceration. In the days leading up to January 6, Clark described the upcoming events as a "revolt," and, after reaching the Capitol, texted his friends multiple times to brag about "storm[ing]" the Capitol. While inside, Clark joined at least one collective push against police officers. In total, he spent approximately nearly 40 minutes inside the building. Muntzer, meanwhile, pushed against officers outside the Old Senate Chamber, at the Rotunda doorway, and in the middle of the Rotunda, and, unlike Clark, was convicted of violating 18 U.S.C. § 231(a)(3). Moreover, in *Clark*, the defendant was given a three-point reduction from his sentencing guidelines calculation for acceptance of responsibility. Muntzer chose the opposite

path. Muntzer's lack of remorse, statements he would do it all over again, threats to his Pretrial Services Officer, and pushes against police officers are aggravating.

In *United States v. Williams*, 21-cr-377 (BAH), the defendant was found guilty of a felony violation of 18 U.S.C. § 1512(c)(2), as well as various misdemeanor charges, after a jury trial and was sentenced to 60 months' incarceration. Like Muntzer, after the 2020 presidential election, Williams issued a series of social media posts expressing his anger that Donald Trump lost and stating his intention to go to the Capitol on January 6 to "Hold the Line" to stop the certification of the election results. Williams helped rioters flank police officers on the West Front, stole water bottles from USCP, entered the Capitol for six minutes, and celebrated by smoking marijuana. Unlike Muntzer, Williams only assisted others to climb areas on the West Plaza or was near the front of the mob during confrontations with police – he did not physically attack the police. Williams, like Muntzer, then resisted police officers' attempts to remove him from the Rotunda. Like Muntzer, Williams later bragged on social media, expressing no remorse. Although Williams stole water bottles and smoked marijuana inside the Capitol, Williams was not convicted of violating 18 U.S.C. § 231(a)(3), he did not physically engage with police officers, and he did not threaten his Pretrial Services Officer, which are aggravating.

In *United States v. Bru*, 21-cr-352 (JEB), the defendant was found guilty of felony violations of 18 U.S.C. §§ 231(a)(3) and 1512(c)(2), as well as various misdemeanor charges, after a bench trial and was sentenced to 60 months' incarceration. On January 6, Bru battled with police officers on the West Plaza before entering the Capitol and entering the Senate Gallery. While Bru absconded from pretrial release, Muntzer's compliance has not been perfect. While Bru was defiant of the Court's authority throughout the proceedings, he did not take the stand and perjure

31

himself. And Bru engaged in a single act of civil disorder (pushing at the police) outside the Capitol; Muntzer battled police inside the Capitol and in several areas – including in the hallway to the Senate.

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## IV.   FINE

The defendant's convictions subject him to a statutory maximum fine of $250,000 for Counts One and Two, $100,000 for Counts Three and Four, and $5,000 for Counts Five and Six. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). Muntzer has continued his obstructive conduct and lack of respect for Pretrial Services by not submitting his financial forms. *See* PSR at ¶ 109. The guidelines fine range here is $10,000 to $95,000. U.S.S.G. § 5E1.2(c).

## V.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has

suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But because MUNTZER was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[10]

---

[10] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Muntzer to pay $2,000 in restitution for his convictions on Counts One and Two. This amount fairly reflects Muntzer's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VI.    CONCLUSION

For the reasons set forth a100484bove, the government recommends that the Court impose a sentence of 54 months of incarceration, 36 months of supervised release, $2,000 in restitution, a mandatory assessment of $100 each for Counts One and Two, a mandatory assessment of $25 each for Counts Three and Four, and a mandatory assessment of $10 each for Counts Five and Six.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    */s/ Brian D. Brady*
       BRIAN D. BRADY
       Trial Attorney, Department of Justice
       DC Bar No. 1674360
       601 D Street, N.W.
       Washington, D.C. 20530
       (202) 834-1916
       Brian.Brady@usdoj.gov

       */s/ Sean J. Brennan*
       SEAN J. BRENNAN
       Assistant United States Attorney
       NY Bar No. 5954128
       601 D Street NW
       Washington, DC 20530
       (202) 252-7125
       sean.brennan@usdoj.gov

36